Filed 2/10/25  J.C. v. Superior Court CA1/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| J.C., et al.,<br><br>        Petitioners,<br><br>v.<br><br>THE SUPERIOR COURT OF CONTRA COSTA COUNTY,<br><br>        Respondent;<br><br>CONTRA COSTA COUNTY CHILDREN & FAMILY SERVICES BUREAU et al.,<br><br>        Real Parties in Interest. | A171654<br><br>(Contra Costa County Super. Ct. No. J23-00459) |

In this juvenile writ proceeding, J.C. (father) and K.P. (mother) seek extraordinary relief from the juvenile court's order terminating reunification services with respect to their daughter P.P. (born November 2022) and setting a permanency planning hearing pursuant to section 366.26 of the Welfare and Institutions Code.[1]  Both parents argue that the juvenile court erred in failing to extend their reunification services to the 18-month mark and abused its discretion by reducing their visitation with the minor pending the permanency planning hearing.  Father additionally claims that the

---

[1] All statutory references are to the Welfare and Institutions Code.

court's detriment finding at the 12-month hearing was not supported by substantial evidence and that he was not provided reasonable visitation services. We deny the petitions.

## I. BACKGROUND

In June 2023, the Contra Costa County Children & Family Services Bureau (Bureau) received a referral stating that mother repeatedly left infant P.P. alone in the home of the maternal grandmother and maternal aunt without letting anyone know she was leaving and without asking anyone to care for the infant. It was further suspected that mother was using marijuana. Two months later, while the initial referral was still pending, mother texted an acquaintance with whom she was living to tell her she was going to work and was leaving P.P. unattended. Mother claimed the baby would be "fine." When the housemate saw the text over four hours later, she asked a friend to go check on P.P. Approximately five hours after mother left the minor alone, the friend found P.P. in the residence, crying, disheveled, and wearing extremely soiled clothing.

The baby was transported to the hospital, where it was observed she had a bump and bruising on her left temple. Mother was eventually cited for child endangerment. She acknowledged that she had "messed up" and that this was not the first time she had left the minor alone when going to work. Before she left on this occasion, she had not observed any bumps or bruises on P.P.'s forehead. Mother identified J.C. as P.P.'s biological father, confirmed through DNA testing, but stated J.C. had never seen the child, did not provide financial support, and did not believe the child was his.

Mother, who was 21 years old at the time, reported being diagnosed with posttraumatic stress disorder (PTSD), anxiety, and depression after being raped at age 13 and sexually assaulted at age 18. She had previously

2

taken psychotropic medications, but stated she stopped after her therapist told her she no longer needed them. Mother and P.P. had lived with the maternal grandmother, who would help mother care for the infant, until the maternal grandmother relocated. The maternal grandmother disclosed that she had been kicked out of her previous residence due to mother's behaviors, which included screaming in the streets, cursing, and throwing things. She did not invite mother to reside in her new home and asked the Bureau not to reveal her address to mother.

Father, who was 49 years old at the time of the referral, resided with mother from December 2021 to May 2022 after meeting her on a BART train. He explained their separation saying, " 'she had to go as she is abusive and manipulative.' " Father acknowledged that mother told him P.P. was his child and that he had taken a paternity test in April 2023 but stated he had never received the results. He declared that, if he was the minor's father, he was capable and willing to care for her.

The Bureau filed a juvenile dependency petition on August 7, 2023, alleging that P.P. was described by subdivision (b)(1) of section 300 due to mother repeatedly leaving the infant minor unattended for extended periods, using marijuana, and failing to comply with mental health treatment. Mother's behavior was described as angry, aggressive, abusive, and manipulative. The minor was formally detained in foster care at the detention hearing on August 8, 2023. At that hearing, the biological father, J.C., was raised to presumed father status. Visitation was ordered for each parent, a minimum of twice a week for a total of two hours. Mother's visitation was ordered to be supervised. Father's visitation was ordered supervised at the Bureau's discretion, and the Bureau was given the

authority to allow for overnight visits with father for up to 29 consecutive days.

At the first calling of the jurisdictional hearing on August 31, 2023, mother was granted a continuance. The juvenile court refused father's request to modify the visitation orders, stating counsel could readdress the issue at the next hearing. At the continued hearing on September 7, mother was granted an additional continuance. Father did not raise any issues with respect to visitation. On September 28, mother and father each filed a waiver of rights and jurisdiction was established based on slightly revised petition language. Specifically, the amended petition still recounted how mother had left the minor unattended on more than one occasion but deleted language that it was for "extended" periods of time. It cited mother's mental health diagnoses as putting the minor at risk of harm but struck the language describing her behaviors and stating that she was not compliant with mental health treatment. Finally, it deleted the marijuana allegation with the agreement that mother would take three random drug tests in a month and, should anything other than marijuana be detected, she would continue to drug test and engage in substance abuse treatment.

In advance of the dispositional hearing, the Bureau filed a report recommending reunification services for both parents. During dispositional interviews, mother stated that father was emotionally abusive to her and made fun of her mental health problems. Father stated mother was physically abusive to him on at least two occasions and, when she did not get her way, she would scream in his apartment complex and destroy his property. The Bureau was concerned that father did not appear to understand mother's mental health issues; he saw her as a grown woman who should know how to act.

4

Mother contacted father several months after moving out and told him she was pregnant. She also contacted him after she delivered P.P., and mother's family members subsequently called him repeatedly and asked him to provide financial support. Father stated he wanted to see the baby and wanted verification that he was the father, but this never happened. He was contacted by a child support agency in March 2023. Although mother took full responsibility for leaving P.P. alone, she did not seem to understand how leaving a child alone was a safety issue. Father viewed himself as a nonoffending parent, although he was not proactive about his parenting role when he found out about P.P., making him a stranger to her.

At the time of the dispositional report, mother did not have a safe and stable place to stay. She had engaged in therapy and enrolled in a parenting class. She admitted to smoking marijuana approximately twice a week to help her anxiety. Father was living in a studio apartment, but, upon inspection, the home was not in a state where the minor could spend time there. He was employed full time and identified some family and friends who might help him care for P.P. He declined to share his strengths or needs because he considered himself nonoffending and believed he should have immediate custody of his daughter.

P.P. had been very behind developmentally when she entered foster care. At nine months, she could not sit up by herself, could not rollover, did not try to grab things with her fingers, and did not attempt to scoot. If left laying down, she would cry, making a loud screeching noise. In addition, she had trouble with emotional regulation, would startle easily, was hyper-vigilant, struggled with going to sleep, and appeared afraid of going to men. After two months in foster care, P.P. could roll over, crawl, pull herself to a

stand, hold food, and self-feed.  She was babbling and smiling and had adjusted well to daycare.

Mother attended most of her visits—missing only two for failure to confirm—and was generally attentive to and interactive with P.P.  However, there were concerns about mother not reading the minor's cues (dressing her in uncomfortably small clothes because they were cute; force feeding the child when she was not hungry) or understanding her developmental stage (sitting her in chairs without proper support).  Mother did not take direction or feedback well in these situations.  When she missed her second visit, mother came to the office demanding to see P.P. and escalated to the point that it took several people to calm her down.  Father was also consistent with his visits.  P.P. was initially unwilling to go to him but, over time, became more comfortable with him holding and playing with her.

Although he knew of the minor's existence, father did not provide care or support for P.P. and did not come forward until the child had been placed in foster care.  His home did not have the basic provisions necessary to care for the minor, nor had necessary safety precautions been taken.  Father also did not understand, and was insensitive to, mother's mental health issues.

At the dispositional hearing on November 2, 2023, the juvenile court declared the minor to be a juvenile court dependent and ordered reunification services for both parents.  Mother was ordered to complete a psychological evaluation and comply with treatment; participate in random drug testing; and attend parenting classes.  Father was required to complete a psychological evaluation and attend parenting classes.  Visitation for mother and father was ordered a minimum of eight hours four times per month, to be supervised at the Bureau's discretion.  The Bureau was also given the discretion to authorize overnight visits for either parent.

However, less than a month later, on November 28, 2023, the court suspended mother's visitation with the minor until she complied with mental health treatment. The Bureau requested the change due to mother's escalating erratic and dangerous behaviors. For example, mother sent a series of e-mails to father, calling him names and threatening him. According to mother, father told her he had numerous babies, with the family choosing which ones to support. In addition, mother stated father had hired a hit man to kill her and P.P. in the past. Mother threatened to sue the social worker for lying in reports and, at one point, walked aggressively toward the social worker while the worker was holding another foster child, yelling and recording the interaction. On another occasion, mother carried the minor into the lobby after a visit and recorded with her other hand while she screamed and cursed at the foster parent and accused the foster father of raping P.P. She set the minor down and took off her diaper to show everyone in the lobby that P.P. was being raped. P.P. was crying the whole time and falling out of mother's arm. Eventually, mother handed over P.P. so she would not get arrested, and the visitation supervisor, the foster mother, and the minor relocated to another room. Mother began throwing things in the lobby and knocked over chairs and a table before walking out.

On February 8, 2024, the juvenile court appointed a guardian ad litem for mother and reinstated supervised visitation for her once per week for one hour. The court also relieved counsel for father following a *Marsden*[2] hearing. It stated it would not consider placement of the minor until new counsel was appointed.

In its report for the six-month review hearing, the Bureau recommended that reunification services be terminated for both parents.

---

[2] *People v. Marsden* (1970) 2 Cal.3d 118.

Mother was reportedly living in an RV (recreational vehicle) in an undisclosed location but was open to moving to a shelter. She was a full-time college student majoring in child development and hoping to find a job working with children. During the reporting period, the social worker repeatedly had to redirect mother away from focusing on father or on efforts outside of her case plan. Mother continued to contact father, telling him to stop showing up for court, stating that he was stalking her, and threatening that she would have him arrested. In March, mother punched the maternal grandmother repeatedly in the head while she was driving and told her she would kill her if she lost her baby. Battery charges were filed.

Mother was seeing a psychiatrist, had been diagnosed with adjustment disorder with anxiety, and was taking prescribed medication that she found helpful. Mother also reported benefitting from seeing a therapist. She had completed her parenting class. Mother had a number of no shows for her drug testing, otherwise testing positive only for marijuana. Despite her participation in services, mother had not shown the behavior changes needed to be able to safely parent P.P., and her mental state was still unstable. Although she had "unwavering love" for P.P., mother could not consistently acknowledge that she had put the minor in an unsafe situation by leaving her alone.

Father continued to work full time but was unhoused and living in his car. He refused to sign his case plan, reiterating that he was the nonoffending parent. When mother charged at father after a court hearing in February, yelling and alleging the foster parents were raping P.P., the court worker suggested father obtain a restraining order with the help of the Bureau's domestic violence liaison, but he had not done so. He declined to

participate in any services, stating he would play "*the long game*" and reunify with his daughter "*another way*."

Both parents visited consistently with P.P. but required a lot of prompting in order to engage with her in an age-appropriate way. The contested six-month review hearing was held over several days in June and July 2024. After denying mother's *Marsden* motion and hearing evidence and argument, the court continued reunification services to the 12-month mark.

In advance of the 12-month hearing, the Bureau again recommended that reunification services be terminated for both parents. Mother had entered a homeless shelter on June 6, 2024, and was invited to participate in a 90-day program of classes, including anger management, to show her what the shelter's yearlong Life Transformation Program was like. Mother only participated for one month and thus did not complete any courses. She cited employment reasons for her shift back to the regular shelter. Although she could have reunified with P.P. in the Life Transformation Program and was urged to reconsider, mother was reluctant because she would not have her cell phone for a period of days and was worried she would not be able to visit or do services. The social worker explained that she would still be able to continue her case plan with her current providers. Nevertheless, mother refused to enter the program without P.P. Later, mother stated she would join the program on September 10, 2024.

At the end of July, mother accidentally sent a text to the social worker that she said was meant for the maternal grandmother in which she again complained about being stalked. She claimed it had to do with an ex-boyfriend rather than father. Mother did not want to admit to the social worker that she was employed since it was her employment that caused the dependency. The social worker explained it was not employment that was

the problem but rather the unsafe situation in which mother left P.P. while working. Mother stated father had sent messages threatening to take P.P. in the past which she wanted to admit in court. She felt it was a " 'coincidence' " that P.P. was now in foster care. On September 5, 2024, the social worker received a text accidentally sent to her by mother, stating: " '*Being stalked don't follow me. I know where everyone live* [*sic*]. *When it's my turn everybody better be ready.*' " Mother again maintained the message was to the maternal grandmother about another ex-boyfriend.

Mother stated she was medication compliant but the social worker's attempts to confirm this were not successful. Mother continued to do well in therapy and noted a reduction in anger and anxiety. Although she still had several no shows, she was testing negative for all substances since May 2024. She was able to articulate a basic plan of age-appropriate foods and activities for P.P.

Father was still living in his vehicle and, at his request, the social worker sent him housing resources in June 2024. He continued to state he did not want to work with the Bureau, and, despite numerous attempts by the social worker, the two had no contact after June. He continued to decline participation in services, stating he did not trust the Bureau. Both parents were consistent in their twice weekly visitation, although father still had issues reading P.P.'s cues, and the minor still showed some reticence in engaging with father.

The Bureau opined that it would be detrimental to return P.P. to either parent. Mother had not made the necessary behavioral changes to be a safe parent, still struggled to recognize the underlying basis for the dependency, had not completed the shelter program (which included an anger management program she had agreed to attend at the last hearing), and

10

continued to show signs of paranoia.  Father consistently refused to engage with the Bureau, did not complete his case plan, and had not shown the Bureau he had a stable living situation for the minor.

A contested 12-month review hearing was held over several days in October and November 2024.[3]  While the hearing was pending, mother raised concerns that P.P. was being sexually abused in foster care, as she had at the beginning of the case.  Mother was observed excessively cleaning the minor during diaper changes to the extent that P.P. would say " 'ow' " and try to lock her legs.  These behaviors were not observed with other care providers and were one of the reasons mother's visits remained closely supervised.  The social worker believed it was in the minor's best interest to reduce mother's visitation at this point.

Mother had left the shelter and would not share her location with the social worker.  The social worker tried to assist mother in entering another program, especially since she was pregnant again, but mother continued to state she could not afford it despite the worker telling her repeatedly how she could access the necessary funds through general assistance.  The social worker was finally able to speak with mother's new psychiatrist, who had diagnosed her with PTSD and major depressive disorder (in remission) as well as generalized anxiety.  Mother was still struggling with her anxiety, but was using tools she had learned to help manage it.  The social worker testified that, though there were still moments of concern, mother's behavior had improved and was less unpredictable than it had been at the beginning of the dependency.

While the hearing was ongoing, father finally contacted the social worker, explaining he did not make himself available sooner because he was

---

[3] Father was again represented by new counsel at this hearing.

upset about a portion of the social worker's previous court testimony. He also felt ambushed when she attempted to engage with him after a visit. Father indicated wanting to have P.P. with him but presented no plan for caring for her. The social worker was concerned about father refusing to take a parenting class as he would misread the minor's cues during visits. This behavior during visits was one of the reasons the visits remained supervised. The case plan requirement for a psychological evaluation stemmed from Bureau concerns regarding father's perceived paranoia regarding both the Bureau and mother. However, the real problem for the social worker was not lack of compliance with his case plan or father's living situation but rather the fact that she had not been able to fully assess his ability to safely parent P.P. She was also concerned that father would not cooperate with the Bureau if P.P. was placed with him so that it could monitor the minor.

At the conclusion of the hearing, the court terminated reunification services and set the matter for a permanency planning hearing pursuant to section 366.26, so that a permanent out-of-home plan could be established for P.P. In doing so, the court concluded there would be a substantial risk of detriment to P.P. if she was placed with either parent, noting that both parents had declined to provide the social worker with information about their current living situations and neither had demonstrated the protective capacity necessary to be granted custody of the minor. While mother had made "real efforts" to comply with her case plan, her continuing behaviors showed that she had not successfully addressed the issues which brought P.P. into the dependency system.

Father remained hyper-fixated on the inclusion of certain information in a court report and could not be focused on his case plan. He failed to communicate with the Bureau despite the social worker going "above and

beyond" to try to assist him. Rather, he was so fixated on principle and side issues that he was unable to prioritize his child. And, while it is normal to have a "healthy amount of distrust of the system, [father's distrust] seem[ed] to go above and beyond." In addition, there was evidence that father had gaps in his parenting knowledge that parenting classes could have addressed. The court further found that the Bureau had made "extraordinary efforts to provide father with resources, that he has continually refused for over a year." And it opined that father's lack of transparency and his comments regarding getting P.P. "another way" supported the decision not to offer father unsupervised visitation.

With respect to a substantial probability of return by the 18-month mark, the court found that both parents had consistent and regular contact with P.P. However, neither parent had shown "at all" that they had made significant progress in resolving the problems that led to the dependency. With respect to being able to complete the case plan objectives if granted additional time, while mother had worked hard on her case plan, there was "no indication" this had translated into the required behavioral changes. And father made clear he was not willing to do anything but visit. Although the court adopted the Bureau's recommendation to terminate reunification efforts, it found the Bureau's request to reduce visits to once per month "too drastic." The court recognized that the case had shifted to focus on the minor's interests rather than the parents' but adopted the suggestion of minor's counsel for visitation twice a month for two hours. A permanency planning hearing was set for February 2025.

Timely writ petitions from both mother and father followed.

## II. DISCUSSION

### A. Detriment Finding with Respect to Father

At a 12-month hearing, "[a]fter considering the relevant and admissible evidence, the court shall order the return of the child to the physical custody of their parent . . . unless the court finds, by a preponderance of the evidence, that the return of the child to their parent . . . would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd. (f)(1).) It is the social worker's burden to establish this risk of detriment. (*Ibid.*) Among other factors, "[t]he court . . . shall consider the efforts or progress, or both, demonstrated by the parent . . . and the extent to which they availed themselves of services provided." (§ 366.21, subd. (f)(1)(C).) On appeal, "[w]e review the juvenile court's finding of detriment for substantial evidence by considering whether the evidence, contradicted or uncontradicted, supports the court's finding." (*L.C. v. Superior Court* (2024) 98 Cal.App.5th 1021, 1034.)

Here, father advances myriad reasons why substantial evidence did not support the juvenile court's finding at the 12-month hearing that it would be detrimental to place P.P. in his care. He asserts that a parent's distrust or inability to get along with the social worker is not, in itself, evidence of detriment. (*In re Ma.V.* (2021) 64 Cal.App.5th 11, 25 ["While a social worker or juvenile court may feel more comfortable and confident about a parent who is friendly and gets along with them, that is not what the law requires."].) He further contends that the court's view that his level of distrust appeared "to go above and beyond"—based on things such as his refusal to sign Bureau paperwork, his hesitance to speak with the social worker by phone, and his hyper-fixation on the inclusion of certain information in a Bureau report—did not constitute substantial evidence he had mental health issues. Father also

14

argues there was no nexus between his behavior in relation to the Bureau and his ability to care for P.P. While he acknowledges that he continually refused to participate in his case plan, he suggests that "[p]erfect compliance" is not a prerequisite to custody. And he claims the case plan should have been updated to remove the requirement for a psychological evaluation; failure to complete a parenting class is not substantial evidence of detriment; he showed an ability to meet P.P.'s basic needs during visitation; being unhoused cannot support a finding of detriment; and any lingering concerns of the court could have been ameliorated by giving father custody of P.P. under a family maintenance plan. Father misses the forest for the trees.

Here, father purposefully chose not to comply with the court-ordered service plan intended to reunify him with his daughter. He had been required to cooperate with the social worker, meet with the social worker to review progress, demonstrate the ability to maintain a clean, healthy and safe home, and provide adequate food for the child. Father was also required to submit to a psychological examination and attend a parenting education class. But he intentionally refused the Bureau's efforts. Indeed, by the contested 12-month status review hearing, father had been avoiding his social worker for months. He did not respond to the worker's repeated attempts—by text message, telephone calls, and e-mail—to engage him. He likewise did not avail himself of the support, housing resources, and service referrals offered by the Bureau. This inaction left the Bureau in the dark about his capacity to safely parent P.P. if she were to be placed with him. His refusals undermined the Bureau's ability to create a plan to transition the minor to his custody.

Instead, father limited his participation to supervised visits with P.P., twice per week for one hour each visit. While father showed steady

15

attendance at the visits, the social worker explained that he did not ask to graduate to *un*supervised visits and she chose not to do so because father still required prompting when engaging with the child, was unable to read some of the minor's cues and engage with her in age-appropriate activities. The hope had been otherwise. The social worker aspired to start a step-down plan where father would move towards unsupervised visits and give the Bureau an opportunity to assess his ability to parent for longer periods of time.

The case plan requirement for father to attend a parenting class was intended to assist father in responding to the minor's cues, a concern identified at the supervised visitation. The Bureau had informed father that his failure to attend parenting class might impact his ability to reunify with his daughter. Despite this warning, father refused to sign up or attend a parenting class.

The court-ordered plan further required father to submit to a psychological evaluation. This exam would have addressed the Bureau's concerns about the paranoia exhibited by the father concerning the Bureau, mother, and information in the disposition report including the mention of a forcible rape allegation that did not result in a conviction. Father refused to be evaluated.

Father's avoidance of the Bureau and his case plan had consequences. At the 12-month status review hearing, the Bureau did not know where he resided. It had been explained that, for father to receive the child into his home, the social worker would have to see where he lived. But father was uncomfortable sharing that information.

Father's refusal to sign Bureau documents, including a release of information, also suggested to the social worker that, if the child were placed

in father's custody, the Bureau would have difficulty communicating with father, obtaining his compliance, and verifying information relevant to his ability to safely parent the minor and meet her needs. One week before the contested hearing, father claimed to be finally willing to take a parenting class. The worker advised him to act quickly and provide her with proof of enrollment. However, the social worker was never provided this proof.

Thus, contrary to father's characterizations on appeal, the record illustrates that this was not simply a case of less than "perfect" compliance with a family reunification case plan and that the juvenile court did not base its findings on improper considerations. From the beginning, father rejected the case plan and declined to engage in all case plan activities except supervised visitation. His inaction posed a significant obstruction to reunification efforts; it deprived the Bureau of a meaningful opportunity to assess his ability to safely parent P.P. And by the time he first voiced a willingness to participate in a parenting class just days before the 12-month hearing, he still did not follow through and enroll. Father showed little, if any, progress during his supervised visitation, and chose not to avail himself of the services and referrals provided. (§ 366.21, subd. (f)(1)(C).)

In a lengthy discussion of the evidence, the juvenile court found that, whatever his reasons for rejecting reunification services, father had prioritized them over his daughter's needs. It concluded that father's failure to provide the social worker with information about his current living situation or to demonstrate the protective capacity necessary to be granted custody of the minor established detriment in the case. Under the circumstances, we see no error and find the evidence supporting the court's detriment finding to be substantial.

17

## B. Substantial Probability of Return

We next consider both parents' claims that the juvenile court erred in failing to extend their reunification services to the 18-month mark. Specifically, each contends that there was a substantial probability P.P. could have been placed with them within the extended timeframe.  We disagree.

When a dependent child is removed from parental custody, the juvenile court ordinarily must order child welfare services for the minor and the parent for the purpose of facilitating reunification of the family.  (§ 361.5, subd. (a).)  For a child under three years of age at the time of removal, as was the case here, reunification services are presumptively limited to six months. (§ 361.5, subd. (a)(1)(B); *Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 843.)  This is because the " ' "unique developmental needs of infants and toddlers" ' [citation] justifies a greater emphasis on establishing permanency and stability earlier in the dependency process." (*M.V. v. Superior Court* (2008) 167 Cal.App.4th 166, 175.)  Reunification services may be continued to the 12-month hearing only if the juvenile court finds that there is a substantial probability that the child may be returned to his or her parent within the extended timeframe and successfully maintained in the home or that reasonable services have not been provided.  (§ 366.21, subds. (e)(3) & (g)(1)(A)–(C).)

Thereafter, at the 12-month hearing, reunification services may be continued again to a hearing 18 months from the date the child was initially removed from the physical custody of their parent, but only if the juvenile court finds that there is a substantial probability that the child may be returned to his or her parent within the extended timeframe or that reasonable services have not been provided.  (§ 366.21, subd. (g)(1).)  In order to find a substantial probability of return to a parent in this context, the

18

court must find (1) the parent has consistently and regularly contacted and visited with the child; (2) the parent has made significant progress in resolving the problems that led to the child's removal from the home; and (3) the parent "has demonstrated the capacity and ability both to complete the objectives of their treatment plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs." (§ 366.21, subd. (g)(1)(A)–(C).) We uphold a juvenile court's findings supporting termination of reunification services if supported by substantial evidence. (*J.H. v. Superior Court* (2018) 20 Cal.App.5th 530, 535.)

Here, the latest date for the 18-month hearing is calculated from the date P.P. was initially detained (August 3, 2023), so it would have been February 3, 2025. (§§ 361.5, subd. (a)(3)(A), 366.21, subd. (g)(1) [at 12-month hearing, court may, under circumstances detailed above, "[c]ontinue the case for up to 6 months for a permanency review hearing, provided that the hearing shall occur within 18 months of the date the child was originally taken from the physical custody of their parent"].) Thus, the question before us is whether substantial evidence supports the juvenile court's determination that there was no substantial probability that P.P. could be safely reunified with either mother or father within the next three months. We conclude that it does.

Mother asserts in her writ petition that the juvenile court erred in refusing to extend her reunification services to the 18-month mark because she had made significant progress in her case plan. Specifically, she notes that she was "thoroughly" involved in therapy and psychiatric care, and her providers felt she was doing well. In addition, the only service she had not completed, an anger management class, could be completed in the extended timeframe.

19

However, participation in services, while important, is not the relevant inquiry here. Rather, as the juvenile court correctly articulated, the question is whether mother had demonstrated positive behavioral change— that is, whether she had made significant progress in resolving the problems that led to P.P.'s removal and had demonstrated the capacity and ability to complete the objectives of her treatment plan in the 12 weeks remaining until the 18-month review. The juvenile court concluded that she had not, opining that from a "behavioral standpoint, we don't seem to be much beyond where we were over a year ago." Specifically, although mother was a "hard worker" and "able to complete tasks," compliance with her case plan had not "translated into behavioral change that suggests that she is any more capable of providing for [P.P.]'s health [or] physical[] and emotional well-being." Given mother's decision to leave a shelter program that offered the possibility of reunification with her daughter, her continued paranoid ideation, and her refusal to even share her whereabouts with the social worker, the evidence overwhelmingly supports the juvenile court's conclusion.

As for father, he points to his consistent and mostly positive visitation with P.P., as well as his status as a "nonoffending parent," to argue that the court erred in finding no substantial probability P.P. could be safely placed with him by the 18-month mark. He specifically argues that his refusal to do anything other than visit P.P. is not *substantial evidence* he lacked the capacity to parent P.P. within the extended timeframe. Father again misses the point.

To extend services to the 18-month mark for a very young minor like P.P., a parent must prove all three statutory requirements listed above. While there is no dispute that father had consistent and regular contact with P.P., it is impossible to argue that he had made any significant progress in

20

resolving the problems that required placement of the minor in out-of-home care. Father acknowledges that P.P. was not placed with him at disposition because he was only beginning to form a relationship with her, his home was not approved, and he did not appreciate the significance of mother's mental health issues. While father may have grown his relationship with P.P. over the previous year, as stated above, his complete lack of transparency and refusal to engage with the social worker made it impossible for the Bureau to assess both his current living situation and whether he could safely parent P.P. Substantial evidence therefore supports the juvenile court's conclusion he failed the second statutory requirement. Moreover, with respect to the third requirement—the capacity of the parent to complete their treatment plan and safely parent the child in the extended timeframe—the court remarked: "[F]ather . . . has made it very clear, for over a year now, that he refuses to do anything, other than visiting, and refuses to comply with the remainder of his case plan, even as it comes to communicating with [the social worker], who tried to talk to him in a parking lot and who he refused to speak to until just recently." It is certainly a reasonable inference from these facts that father would be unlikely to change his behavior in any material way over the next 12 weeks. We conclude that substantial evidence supports father's failure to establish the third requirement as well.

## C. Reasonable Services

We have concluded the juvenile court did not err in refusing to continue father's reunification services to the 18-month mark based upon a substantial probability that P.P. could be placed with him during that extended timeframe. Thus, the court was *required* to set a permanency planning hearing pursuant to section 366.26, unless it found that reasonable services had not been provided. (§ 366.21, subd. (g)(1).) Father contends that the

21

services provided to him were unreasonable with respect to visitation because, while the court granted the Bureau discretion to authorize unsupervised and overnight visitation between him and P.P., the Bureau never exercised that discretion. Thus, his visits with the minor remained supervised twice per week for one hour even though he was a "nonoffending" parent, had an excellent record of attendance at visits, and the visits with his daughter were largely positive.

To promote reunification, visitation must be as frequent as possible, consistent with the well-being of the child. (§ 362.1, subd. (a)(1)(A).) Visitation requirements exist "[i]n order to maintain ties between the parent . . . and the child, and to provide information relevant to deciding if, and when, to return a child to the custody of his or her parent." (*Id.*, subd. (a).) However, "[n]o visitation order shall jeopardize the safety of the child." (*Id.*, subd. (a)(1)(B).)

A finding that reasonable services were offered or provided in this context is made by clear and convincing evidence. (§ 366.21, subd. (f)(1)(A).) We review such a finding for substantial evidence, taking into account "the level of confidence this standard demands." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995.) Thus, we must determine "whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Id.* at pp. 995–996.) We conclude that it does.

As discussed above, the social worker testified father would misread the minor's cues during visits, yet he refused to take a parenting class. This behavior during visits was one of the reasons the visits remained supervised. However, again, the real problem was that the social worker simply had been unable to fully assess father's ability to safely parent P.P. given his total lack

22

of engagement with the Bureau.  The social worker was concerned that father would not cooperate with the Bureau if P.P. was placed with him in an unmonitored setting.  In concluding reasonable services were provided to father, the juvenile court opined generally that the Bureau had "made extraordinary efforts to try to provide father with resources, that he [had] continually refused for over a year."  With respect to moving beyond supervised visitation, the court noted the social worker's testimony and also pointed out that father had stated he was "playing the long game" and "going to be getting the child another way," comments that the court felt added a "level of concern" with respect to authorizing unsupervised contact.

In his writ petition, father argues that the court's concerns based on his statements about getting the minor "another way" were speculative. However, even were we to disregard those statements, we would conclude that substantial evidence supports the court's reasonable service finding with respect to visitation.  Father's decision to decline engagement with the Bureau frustrated its ability to assess whether unsupervised contact with the minor would be safe and appropriate.  It also prevented the Bureau from assessing the effectiveness of the case plan goals and activities towards any potential modification, if appropriate.  Here, the Bureau focused the case plan to address the concerns it formed from what social workers learned and observed during the case about the parents, their unhealthy communication style, father's difficulty picking up on the minor's cues, and concerns around father's paranoid presentation, among other information. Despite his avoidance, the social worker continued attempts to inform, warn, and engage father.

Father faults the Bureau for not exercising any of the discretion afforded it under the juvenile court's orders even though father was a

nonoffending parent and consistently participated in positive visits with the child. We note in this regard that the Bureau considered unsupervised visits but did not believe father was ready to progress to them. For over one year, father did not show the social worker that he had the skills to be able to care for the minor full time. Additionally, we observe that father never requested unsupervised visits in the community. And, because he refused to provide information or access to a location where he might host an unsupervised visit, the social worker was unable to expand visits to include home visits. Here, there was no deficiency concerning the Bureau's services, but a lack of interest by the father to take advantage of the services that were offered. (See, e.g., *Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 763 ["real problem was not a lack of services available but a lack of initiative to consistently take advantage of the services that were offered"].)

Under all of these circumstances, we see no error.

## D.  Visitation Reduction

Both parents finally assert that the juvenile court erred in reducing their visitation pending the permanency planning hearing. They focus on the consistency and quality of their visits. They also stress the importance of continued visitation when attempting to establish the beneficial relationship exception to adoption. (See § 366.26, subd. (c)(1)(B)(i).) We see no abuse of discretion.

When a juvenile court terminates reunification services and orders a permanency planning hearing pursuant to section 366.26 at the 12-month hearing, "[t]he court shall continue to permit the parent . . . to visit the child pending the hearing unless it finds that visitation would be detrimental to the child." (§ 366.21, subd. (h).) Here, the court ordered continued visitation, so there is no statutory violation.

As for the frequency of visitation, the juvenile court has "great discretion in deciding issues relating to parent-child visitation," the exercise of which "we will not disturb on appeal unless the juvenile court has exceeded the bounds of reason." (*In re S.H.* (2011) 197 Cal.App.4th 1542, 1557–1558.) Moreover, when reunification services end, "the parents' interest in the care, custody and companionship of the child [is] no longer paramount," and " 'the focus shifts to the needs of the child for permanency and stability.' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317; accord, *In re A.B.* (2022) 79 Cal.App.5th 906, 923.)

In this case, the Bureau initially recommended that visitation be reduced for each parent from twice a week for one hour to once a month for one hour. Bureau counsel argued that it was not in P.P.'s best interests to continue to visit at the higher frequency since she was headed toward out-of-home permanency. Bureau counsel also noted that mother's aggressive behaviors during visits supported a reduction in visitation. Minor's counsel thought the proposed reduction was too drastic and suggested visitation be set at twice monthly for two hours. Mother's attorney asked for visitation to remain the same or, at most, be reduced to once per week. And father's counsel focused on seeking the extension of all of father's services to the 18-month mark.

The court ultimately set visitation for each parent at twice a month for two hours. This was a reasonable order given the competing interests at stake and the primacy of the minor's interests, which the court expressly recognized. It certainly did not exceed the bounds of reason.

### III.  DISPOSITION

The petitions are denied on the merits. (See § 366.26, subd. (*l*)(1)(C), (4)(B).) Because the permanency planning hearing in this matter is set for

25

February 13, 2025, this opinion is final as to this court immediately.  (Cal. Rules of Court, rule 8.490(b)(2)(A).)  Petitioners' requests for a stay of the permanency planning hearing are denied as moot.

SMILEY, J.*

WE CONCUR:

HUMES, P. J.

LANGHORNE WILSON, J.

A171654
*J.C. v. Superior Court*

---

* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.